# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

|  |  |
|---|---|
| MELISSA LILLEHAGEN, *et al.*, on behalf of themselves and all those similarly situated,<br><br>        **Plaintiffs,**<br><br>    **vs.**<br><br>ALORICA, INC.,<br><br>        **Defendant.** | ) Case No.: SACV 13-0092-DOC(JPRx)<br>)<br>)<br>)<br>) **ORDER**<br>)<br>) **GRANTING IN PART AND DENYING IN**<br>) **PART DEFENDANT'S MOTION FOR**<br>) **SUMMARY JUDGMENT [135];**<br>)<br>) **DENYING DEFENDANT'S MOTION**<br>) **FOR DECERTIFICATION [138];**<br>)<br>) **DENYING PLAINTIFFS' MOTION FOR**<br>) **PARTIAL SUMMARY JUDGMENT [159]**<br>)<br>)<br>)<br>) |

Before the Court are Plaintiffs' Motion for Partial Summary Judgment ("P-MSJ") (Dkt. 159), Defendant's Motion for Summary Judgment ("D-MSJ") (Dkt. 135), and Defendant's Motion to Decertify Collective Action ("Decert. Mot.") (Dkt. 138). After reviewing the papers and hearing the oral arguments, the Court DENIES Plaintiffs' Motion for Partial Summary Judgment, GRANTS IN PART AND DENIES IN PART Defendant's Motion for Summary Judgment, and DENIES Defendant's Motion to Decertify.

//

//

//

## I.    Background

### A.  Procedural History

This lawsuit was filed on January 18, 2013. *See* Compl. (Dkt. 1). Named Plaintiffs Melissa Lillehagen, Sharon Shaw, Janna Carlile, Shanai Whitmore, Brenda Luper, and Ignacio Pizana (collectively, "Plaintiffs") are current and former employees of Defendant Alorica, Inc. ("Alorica"). *Id.* ¶ 3.[1] This action involves a single claim under the Federal Labor Standards Act (FLSA). Plaintiffs allege that Alorica uses a company-wide compensation scheme for its customer service representatives ("CSRs") which treats breaks of less than 20 minutes during a CSR's continuous workday as uncompensated time. Specifically, Alorica calculates CSRs' pay based on when CSRs log in and log out of a timekeeping system and does not pay CSRs for times during the day when they are logged out for brief periods of under 20 minutes. Plaintiffs argue that, under FLSA, all of these brief log-out periods should be compensated as hours worked. D-SUF No. 8; Compl. ¶ 7.

On October 24, 2013, the Court conditionally certified a nationwide FLSA class of all individuals who work or have worked as Alorica CSRs between August 9, 2010 to the time of trial, excluding CSRs who worked only at Alorica's facility in Terre Haute, Indiana during this time period. Order Granting Pls.' Mot. for Conditional Class Certification, Oct. 24, 2013 ("Class Cert. Order") (Dkt. 67); Order Denying in Part Objections to Proposed Notice, Oct. 31, 2013 (Dkt. 72) at 1.[2] Potential class members were notified and over 8,700 individuals opted in to the collective action. *See* Notices of Consent to Join (Dkts. 53, 68, 74, 77, 80, 88, 90-103, 105, 108-114).

On September 22, 2014, Plaintiffs and Defendant filed cross-motions for summary judgment (Dkts. 135, 159). Defendant also filed a motion to decertify the collective action and a motion to compel 155 of the Opt-In Plaintiffs to arbitrate (Dkts. 137, 138). Oppositions, replies,

---

[1] The parties stipulated to substitute Brenda Luper and Ignacio Pizana as named plaintiffs in place of Akesha Grizzard and Joshua Dickson on June 9, 2014. *See* Order to Dismiss Akesha Grizzard and Joshua Dickson and Substitute Opt-in Plaintiffs Brenda Luper and Ignacio Pizana as Named Plaintiffs, June 9, 2014 (Dkt. 123).

[2] CSRs in Terre Haute are litigating the same claim in a prior-filed FLSA collective action in the federal district court in the Southern District of Indiana, *Hawkins v. Alorica, Inc.*, No. 11-0283-JMS-WGH (S.D. Ind.).

and additional briefing were filed (Dkts. 171, 172, 184, 185, 191, 193, 194, 195, 215). Oral argument was heard on the motions on November 17, 2014 (Dkt. 213).

### B.  Facts

#### 1.  Alorica's Business

Alorica provides telephone-based customer services for its corporate clients, including telephonic technical support and telephonic sales services and support. Between January 18, 2010 and the present, Alorica acquired two other call center companies, Ryla Teleservices, Inc. ("Ryla") and PRC, LLC ("PRC"), as well as all of their accounts. The over 8,700 CSRs who have opted into this collective action worked at approximately 37 different call center locations in at least 16 states. CSRs are on the front line of Alorica's business. They handle inbound and outbound telephone calls with customers of Alorica's clients and provide them with service and support. *See* Pls.' Statement of Uncontroverted Facts ("P-SUF") (Dkt. 160) No. 3-4; Defs.' Statement of Uncontroverted Facts ("D-SUF") (Dkt. 136) No. 1-2.

CSRs are non-exempt employees and Alorica pays them by the hour, on a biweekly basis. Full-time CSRs typically work an eight-hour shift, excluding their unpaid meal period. Alorica typically provides CSRs with one scheduled 30-45 minute meal period per eight-hour shift and two scheduled breaks of 10-15 minutes each per eight-hour shift. *See* P-SUF Nos. 5-9; D-SUF No. 9. In addition to their two scheduled breaks, CSRs sometimes take unscheduled breaks during their shifts to use the restroom or to get a glass of water or a snack. P-SUF Nos. 41-42.

#### 2.  EIS Timekeeping System

Alorica requires CSRs to track their time worked by using an electronic timekeeping system at their workstation. P-SUF No. 10. Most of Alorica's facilities use a proprietary timekeeping system called Employee Information System (EIS), although Alorica also used Kronos at select sites until 2013. P-SUF No. 13; Declaration of Anne Romagnino ¶ 8 (Dkt. 141). CSRs must use "login" and "logout" buttons on their phones or computers each day to record when they start and stop work. P-SUF No. 11. The phone log-in system is referred to as the "hard phone" system; the computer log-in system is referred to as the "soft phone" system. D-SUF No. 11.

To start recording their work time on EIS, CSRs log into the timekeeping system by pressing the "LOGIN" button on their phone or computer. P-SUF No. 14. When CSRs get logged out of the system, EIS stops recording their work time. P-SUF No. 15. During the day, in addition to using the LOGIN and LOGOUT buttons, a CSR will also use various "AUX" buttons on their phone or computer. When the CSR's system is in "AUX mode," his or her phone temporarily stops receiving calls. P-SUF No. 46. CSRs are not paid for time recorded in EIS under the "Lunch" AUX code. CSRs are paid for time recorded in EIS under other AUX codes, which include "Break" (for scheduled breaks and unscheduled breaks), and other codes. P-SUF Nos. 47-49.

### 3.  Policies and Practices Regarding Timekeeping

It is uncontroverted that Alorica had certain written policies for CSRs and for managers of CSRs regarding timekeeping. In general, the written policy was for CSRs to log in at the beginning of their shift and stay logged into the EIS system until the end of the shift when they would log out. When CSRs took their twice daily scheduled breaks or bathroom breaks as necessary, they were supposed to use the "Break" AUX code rather than log out. When CSRs had lunch, they were supposed to use the "Lunch" AUX code rather than log out, except that CSRs at certain facilities during certain time periods had to log out for lunch and then log back in upon returning from lunch because their timekeeping system did not have a "Lunch" AUX code. D-SUF Nos. 17-20.

Alorica's written timekeeping policies emphasized that CSRs were responsible for logging in and out and using AUX codes correctly in order for them to be paid correctly. D-SUF Nos. 18-20. Alorica's written policies also emphasized the importance of "schedule adherence," which included good attendance, punctuality, and adherence to the daily schedule that managers established for the CSRs. Alorica's Employee Handbook warned that employees could be subject to disciplinary action, including termination of employment, for excessive absences, tardiness, or failures to adhere to the schedule. Declaration of David N. Tarlow (Dkt. 148) Ex. C (Beckerley Dep. Ex. 3, Aug. 5, 2014); Ex. D (Campos Dep. Ex. 2, Aug. 1, 2014); Ex. L (Shaw Dep. Ex. 23, Mar. 5, 2014).

Alorica also had written policies for managers. On July 15, 2013, Alorica's Vice President of Human Resources and Administration sent a memorandum to various Alorica managers with the subject "2013 Mid-Year Log In-Log Off Break Policy Clarification." The memo admonished, "Management is not to log out employees from the system while on Break Aux Code" and warned managers, "Do not ask employees to log out of the system for rest or restroom breaks." P-SUF Nos. 56-58. One exception was that managers could log employees out of the system if the employee was gone from his or her workstation for more than 30 minutes and the manager had conducted a diligent search for the employee. Declaration of Allen R. Vaught ("First Vaught Decl.") (Dkt. 162) Ex. E (Smith Dep. Ex. 315, Aug. 5, 2014).

Plaintiffs do not dispute that Alorica had such written policies, but do dispute whether Alorica actually communicated and enforced them. Some managers instructed CSRs to log out when they took breaks instead of using the AUX code. Carlile Dep. 21:21-22:4, Apr. 29, 2014; Reynolds Dep. 23:17-24:21, Mar. 6, 2014; Shaw Dep. 103:2-11; Amend Dep. 48:6-10, 49:16-50:13, Mar. 27, 2014. Some managers would log CSRs out of EIS while the CSRs were away from their workstations to either perform work-related activities and when taking breaks. Some of the CSRs who testified that they themselves had been logged out or that they had seen other CSRs logged out generally could not recall exactly how long they or their co-workers were away from their workstations. Bass Dep. 70:15-73:25, 76:3-77:15, Aug. 12, 2014; Beckerley Dep. 51:23-54:4, Aug. 5, 2014; Campos Dep. 79:24-83:24; Carlile Dep. 57:5-22; Lillehagen Dep. 13:17-20, 89:6-90:21, Mar. 14, 2014; Luper Dep. 60:5-63:23, July 11, 2014; Moore Dep. 62:25-65:21, Aug. 11, 2014; Tellez Dep. 60:21-61:25, Aug. 1, 2014. Sometimes other issues got in the way of accurate timekeeping, such as computer failures that caused CSRs to be involuntarily logged out. P-SUF No. 37. Or, sometimes CSRs had to log out to switch computer workstations. P-SUF No. 38. Managers did not always automatically correct CSRs' timesheets so that CSRs would be compensated for those times. Whitmore Dep. 156:9-158:19, Mar. 4, 2014.

//

//

### 4.   Policies and Practices Regarding Calculating Pay and Resolving Pay Discrepancies

Alorica calculates a CSR's wages based on the total hours logged in EIS and on the manager's adjustments or corrections. P-SUF No. 18, 21; Romagnino Decl. ¶¶ 6-8 (Dkt. 141). Managers can make manual adjustments or corrections to a CSR's timesheet in EIS before the timesheets are locked at the beginning of the payroll week and submitted to payroll. P-SUF No. 25. After a timesheet is locked, a CSR can still report a pay discrepancy and the CSR's manager can still work with human resources and payroll personnel to resolve them, but the data is not directly reflected in the EIS time records. P-SUF Nos. 32, 34, 35; D-SUF No. 48. If there are no manual adjustments by managers or other changes made further downstream, then the CSR's wages are calculated just on the raw log-in and log-out data in EIS. *See* P-SUF No. 24.

Alorica's policy requires CSRs to review their time records within EIS before EIS timesheets are locked and submitted to payroll. P-SUF No. 27; D-SUF No. 47. Alorica also requires managers to review CSRs' timesheets for accuracy during each two-week pay period. P-SUF No. 29. Managers must review hours worked and the start and stop times in EIS timesheets daily. P-SUF No. 30. Every two weeks, the Payroll Department is required to review timesheets, "hours" files, and "preview reports" for accuracy. P-SUF No. 60. The preview reports received by the Payroll Department contain CSRs' hours and payroll before each pay period, which must be screened before payroll closes. P-SUF No. 61.

Some of the CSRs who were deposed reviewed their timesheets regularly. Carlile Dep. 60:3-7; Campos Dep. 88:21-89:22; Whitmore Dep. 139:8-17.  Others did not, for various reasons including not having access to the timesheets, not knowing how to read them, or not having time during their busy shifts because they were expected to be on the phone as much as possible. Carlile Dep. 40:20-41:6; Lillehagen Dep. 100:19-101:10; Luper Dep. 50:4-11; Moore Dep. 51:10-14; Shaw Dep. 130:13-132:19; Whitmore Dep. 138:23-139:13. Some had reported pay discrepancies to their managers. Sometimes the discrepancies were then fixed; sometimes not. Carlile Dep. 40:8-41:10; Luper Dep. 68:16-69:17; Pizana Dep. 82:15-83:6, 84:13-19, Aug. 2, 2014; Whitmore Dep. 161:4-162:18.

### 5. Log-Out Episodes

CSRs' raw log-in and log-out data from EIS shows many instances where CSRs were logged out for short periods of less than 20 minutes during their shift. *See* Second Vaught Decl. Exs. U-FF; Declaration of Dwight D. Steward, Ph.D. ¶ 30 (Dkt. 161).[3] The Court will refer to these brief periods as "log out episodes." The data reflects adjustments made by managers before the timesheets were locked, but not corrections to a CSR's pay made after the timesheets were locked. Those corrections would be reflected in pay discrepancy forms. There do not appear to be very many pay discrepancy forms related to short periods of less than 20 minutes. Declaration of Allen R. Vaught ¶ 73 ("Second Vaught Decl.") (Dkt. 187) (noting that only 13 out of 755 pay discrepancy forms produced by Alorica are related to short breaks of less than 20 minutes).[4]

The Named and Opt-in Plaintiffs who were deposed generally do not recall specific episodes when they were logged out. They do not recall the circumstances surrounding each episode, such as whether their computer or phone system was down or whether they were on a scheduled break or unscheduled bathroom break, late coming back for break, or attending team

---

[3] Defendant object to Plaintiffs' expert report on the ground that Plaintiffs failed to disclose the expert and provide the expert report to Defendant by the deadline and thus should not be permitted to use Dr. Steward as an expert witness for any purpose. Under Federal Rule of Civil Procedure 26(a)(2), expert witnesses must be disclosed to the opposing party at least 90 days before the date set for trial unless the court orders otherwise. Under Rule 26(b)(4)(A), a party may depose any identified expert witness whose opinions may be presented at trial, but only after the expert report is provided. "If a party fails to . . . identify a witness as required by Rule 26(a) . . . , the party is not allowed to use that . . . witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c).

The Court's July 25, 2013 scheduling order set August 22, 2014 as the discovery cut-off for fact and expert discovery and January 27, 2015 as the trial date. No specific deadline was set for expert disclosures, so the default deadline was on or around October 29, 2014. (On August 7, 2014, the parties requested that the Court modify its scheduling order to push back the motion cut-off, expert disclosure and discovery, and trial dates (Dkt. 124). The Court denied the request on August 28, 2014 (Dkt. 127).) Defendant claims that Plaintiffs violated Rule 26(a)(2) by failing to disclose the expert witness's identity and report before the discovery cut-off because Plaintiffs' failure to disclose by that date deprived Defendant of the opportunity to depose Dr. Steward. However, Plaintiffs identified the witness and provided the expert report when Plaintiffs' motion for summary judgment was filed on September 22, 2014, a month before the default expert disclosure deadline. Since Plaintiffs have followed the letter of Rule 26(a), the Court does not find it appropriate to penalize Plaintiffs pursuant to Rule 37(c).

[4] The Court overrules Defendant's evidentiary objections. *See* Objections to Declaration of Allen R. Vaught ¶ 35 (Dkt. 203). The Court also notes that Defendant has not produced any evidence that substantively contradicts Plaintiffs' observation that the vast majority of the pay discrepancy forms are unrelated to short periods of less than 20 minutes.

meetings away from their workstations. Nor do they recall whether they were ultimately paid for the time spent logged out. Nevertheless, their log-in and log-out data shows that each experienced log-out episodes. Second Vaught Decl. Exs. U-FF.

## II. Compensability of Short Breaks Under the FLSA

One of the central legal questions in this case is whether all short breaks of under 20 minutes are compensable under FLSA as "hours worked," or if the employer need not pay employees for certain types of short breaks. Because this question is important to the resolution of both the Motion for Decertification and the cross Motions for Summary Judgment, the Court addresses this question first.

### A. Statutory and Regulatory Language

FLSA requires employers to compensate employees for all "hours worked." *Alvarez v. IBP, Inc.*, 339 F.3d 894, 902 (9th Cir. 2003) (citing 29 U.S.C. §§ 206, 207; additional citation omitted). 29 C.F.R. § 785.18, promulgated in 1961, states:

> Rest periods of short duration, running from 5 minutes to about 20 minutes, are common in industry. They promote the efficiency of the employee and are customarily paid for as working time. They must be counted as hours worked. Compensable time of rest periods may not be offset against other working time such as compensable waiting time or on-call time. Mitchell v. Greinetz, 235 F. 2d 621, 13 W.H. Cases 3 (C.A. 10, 1956); Ballard v. Consolidated Steel Corp., Ltd., 61 F. Supp. 996 (S.D. Cal. 1945))

29 C.F.R. § 785.18.

### B. Sub-Regulatory Interpretations

In support of their argument that all short breaks must be compensated, Plaintiffs cite to a 1996 Opinion Letter issued by the U.S. Department of Labor ("DOL") interpreting Section 785.18 as a "bright line time test." U.S. Dep't of Labor, Wage and Hour Division, Opinion Letter Fair Labor Standards Act (FLSA) (Dec. 2, 1996), 1996 WL 1005233, at *1 ("1996 DOL Opinion Letter"). The DOL wrote the Opinion Letter in response to an inquiry regarding whether an employer had to compensate employees for their 3- to 4-minute smoke breaks

(totaling no more than 15 minutes per day). In support of the DOL's position that the employees must be compensated for their smoke breaks, the 1996 Opinion Letter stated in relevant part:

> Employees have always taken short work breaks, with pay, for a myriad of non-work purposes -- a visit to the bathroom, a drink of coffee, a call to check the children, attending to a medical necessity, a cigarette break, etc. The Department has consistently held for over 46 years that such breaks are hours worked under the FLSA, without evaluating the relative merits of an employee's activities. . . .
>
> Any modification of the Department's long held position to accommodate your request would require a series of tests to evaluate the relative benefit provided to employee and employer and the impact on employee efficiency of each and every small work break ever taken by any employee.
>
> We believe that such tests would be an undesirable regulatory intrusion in the workplace with the potential to seriously disrupt many employer-employee relationships. Further, it would be difficult, if not impossible, to design practical tests applicable to all workplace circumstances.
>
> While we fully appreciate the extraordinary difficulties presented to employers by smoking in the workplace, we believe that the government should not be in the business of determining what employees do on short work breaks, much less attempting to evaluate which short breaks merit or do not merit compensation. We strongly believe that employers and employees are best served by the bright line time test currently provided in Section 785.18.
>
> We are unwilling, for these reasons cited above, to modify the existing position. The FLSA does not require an employer to provide its employees with rest periods or breaks. If the employer decides to permit short breaks, however, the time is compensable hours worked. Even if the employees agree to forego compensation for the break time, the time is still compensable, because employees may not waive their statutory rights through an agreement with the employer. If the employer permits its employees to take a series of short smoke breaks, the employees must be compensated for their time.

1996 DOL Opinion Letter, 1996 WL 1005233, at *1.

Alorica argues that FLSA and Section 785.18 actually do not require that all short breaks be counted as "hours worked," especially in light of more recent developments in federal wage-and-hour law and regulation, Alorica points to 29 U.S.C. § 207(r), which requires the employer to provide a reasonable break time for a female employee to express breast milk for her nursing

infant up to one year after the child's birth, but does not require the employer to compensate her for that time.[5] Alorica also points to Chapter 31a01(c) of the DOL's Field Operations Handbook, dated December 15, 2000. Chapter 31a01 states in relevant part:

> (a) Rest periods of short duration, running from 5 minutes to about 20 minutes are common in industry. They promote the efficiency of the employee and are customarily paid for as working time. They must be counted as hours worked.
>
> . . . .
>
> (c) Unauthorized extensions of authorized employer breaks are not counted as hours worked for an employee when the employer has expressly and unambiguously communicated to the employee that:
> > (1) The authorized break may only last for a specific length of time;
> > (2) Any extension of such break is contrary to the employer's rules; and
> > (3) Any extension of such a break will be punished.

U.S. Department of Labor, Field Operations Handbook, ch. 31a01(c) (Dec. 15, 2000).

In 2001, DOL issued an opinion letter interpreting Chapter 31a01(c). It stated in relevant part:

> You are requesting an opinion as to whether the unauthorized extension of an authorized break by an employee who has been previously advised of the three conditions of 31a01(c) results in the loss of the <u>entire</u> period of the break from compensable time rather than just the amount of time by which the break has been extended without authorization.
>
> Only the length of the unauthorized extension of an authorized break will not be considered hours worked when the three conditions are met, not the entire break.

U.S. Dep't of Labor, Wage and Hour Division, Opinion Letter Fair Labor Standards Act (FLSA) (May 19, 2001), 2001 WL 1869965 ("2001 DOL Opinion Letter").

---

[5] 29 U.S.C. § 207(r) was added to the FLSA as part of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 4207, 124 Stat. 119, 577 (2010). The Court notes that, although DOL has not yet issued formal regulations regarding § 207(r), DOL has issued a request for information from the public in order to inform the DOL's enforcement decisions. In the request for information, the DOL stated, that, under 29 U.S.C. § 207(r), employers need not pay for breast milk expression breaks to the extent that they extend beyond the time allotted for authorized breaks or constitute additional breaks. Employers still must pay for them to the extent that the employee is using up the authorized break time that the employer allows all employees to have. Reasonable Break Time for Nursing Mothers, 75 Fed. Reg. 80,073, 80,075 (Dec. 21, 2010).

### C.  Deference

Each side urges the Court to defer to the DOL's interpretation of "hours worked." Plaintiffs wish the Court to defer to Section 785.18, or in the alternative to the 1996 Opinion Letter, while Alorica wishes the Court to defer to Chapter 31a01(c) of the Field Operations Handbook and the 2001 Opinion Letter.

It is well established that courts will afford substantial deference to an administrative agency's interpretation of an ambiguous statute

> when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

*United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) (denying *Chevron* deference to agency interpretations made outside of the notice-and-comment process); *see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). An agency's interpretation made outside of a formal notice-and-comment or adjudicatory process nonetheless may be entitled to a lesser degree of deference. Under *Skidmore v. Swift & Co.*, the weight given to such interpretations "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. 134, 140 (1944).

"Where an agency interprets its own regulation," on the other hand, "even if through an informal process, its interpretation of an ambiguous regulation is controlling under *Auer* unless 'plainly erroneous or inconsistent with the regulation.'" *Bassiri v. Xerox Corp.*, 463 F.3d 927, 930 (9th Cir. 2006) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). *Auer* deference has fallen into relative disfavor over the years, with the Supreme Court repeatedly narrowing its scope. For example, the Supreme Court clarified that *Auer* deference is not due if the agency's regulation is unambiguous or if the agency's regulation merely repeats the language of the

statute. *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000); *Gonzales v. Oregon*, 546 U.S. 243, 256-57 (2006). *Auer* deference

> is likewise unwarranted when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question. This might occur when the agency's interpretation conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a convenient litigating position, or a *post hoc* rationalizatio[n] advanced by an agency seeking to defend past agency action against attack.

*Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-67 (2012) (internal citations and quotation marks omitted).

The parties do not dispute that Section 785.18 is due substantial deference under *Chevron* and *Mead*. The dispute is over what the Court should make of Chapter 31a01(c) of the Field Operation Handbook and the 2001 Opinion Letter in interpreting Section 785.18.

A threshold question is whether Chapter 31a01(c) is the DOL's interpretation of FLSA or of Section 785.18. Plaintiffs argue that neither Chapter 31a01(c) nor the 2001 Opinion Letter are due *Auer* deference because neither document explicitly cites to Section 785.18. This argument is unavailing, as Chapter 31a01(a), only two paragraphs above Chapter 31a01(c), repeats Section 785.18 almost verbatim. Likewise, the header for Chapter 31a01 is "Rest periods," a term that does not appear in the FLSA, but is the heading of Section 785.18. It is highly unlikely that the DOL was not thinking about Section 785.18 in drafting Chapter 31a01(c).

The Court next considers whether Section 785.18 is ambiguous. *See Christensen*, 529 U.S. at 588 ("*Auer* deference is warranted only when the language of the regulation is ambiguous."). Plaintiffs argue that the imperative that rest periods of short duration "must be counted as hours worked" makes it clear that all short breaks must be compensated. Plaintiffs cite to numerous cases which interpreted Section 785.18 as requiring short breaks to be compensated without detailed inquiry into the factual circumstances surrounding the short breaks at issue. *See, e.g.*, *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 913 n.18 (9th Cir. 2004); *Hawkins v. Alorica, Inc.*, 287 F.R.D. 431, 442 (S.D. Ind. 2012); *Atkinson v. House of*

*Raeford Farms, Inc.*, No. 6:09-CV-01901-JMC, 2012 WL 2871747, at *3 (D.S.C. July 12, 2012); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 556 F. Supp. 2d 941, 953 (W.D. Wis. 2008).

Alorica argues that the sentence in Section 785.18 stating that rest periods are "customarily paid as working time" demonstrates that DOL's position that FLSA usually requires compensation for rest periods but not always. Also, one of the cases cited in the regulation, *Mitchell v. Greinetz*, held that short breaks should be compensable "when time out is of such a nature that it bears a relationship to the employment time and is beneficial to the employer." 235 F.2d 621, 624 (10th Cir. 1956). *Mitchell* involved short breaks which were permitted by the employer; the court found that, under the facts and circumstances of the case, those breaks benefitted the employer as well as the employees and thus were compensable.

In the Court's view, the more reasonable reading of Section 785.18 is that rest periods "must be counted as hours worked." The use of the word "customarily" and the citation to *Mitchell* appear to be the reasoning supporting the DOL's interpretation of "hours worked," not the DOL's ultimate conclusion as to its interpretation of the statute. A simple imperative that all rest periods must be compensated is also far easier for the DOL, the Court, and litigants to administer. However, given Section 785.18's description of the "rest periods" as "common in industry" and "customarily paid" and the citation to *Mitchell*, which dealt with authorized breaks and held that the compensability of breaks depended on the factual circumstances surrounding them, 235 F.2d at 623, Section 785.18 could reasonably be read different ways. For instance, it could be read as only creating a presumption that rest periods are beneficial to the employer and thus compensable. It could also be read as allowing employers some input in determining which rest periods are beneficial to them, e.g., by allowing employers to control, to some degree, which short rest periods will be paid. Thus, Section 785.18 is ambiguous.

Because Section 785.18 is ambiguous, then the Court must determine which of the DOL's interpretations of Section 785.18, if any, merit *Auer* deference. It is uncontested that *Auer* deference is due to the 1996 Opinion Letter. What is disputed is whether the Court should

afford *Auer* deference to Chapter 31a01(c) and the 2001 Opinion Letter and, if so, how they should be reconciled with the 1996 Opinion Letter.

Plaintiffs argue that Chapter 31a01(c) and the 2001 Opinion Letter are not due *Auer* deference because they break with the DOL's prior, long-standing position that all short breaks should be compensated without providing any reasoning for changing course. The Court is not persuaded that Chapter 31a01(c) is "plainly erroneous or inconsistent" with the 1996 Opinion Letter, Section 785.18, or with FLSA. As Alorica argues, unlike many state wage-and-hour laws, FLSA does not require an employer to provide breaks. Section 785.18 only provides that when short breaks are taken, they must be compensated. Moreover, both *Mitchell* and the 1996 Opinion Letter only dealt with breaks allowed by the employer. This might be because the situations presented to the court and to the DOL happened to involve authorized breaks. However, the focus on authorized breaks in *Mitchell* and the 1996 Opinion Letter, in combination with the fact that FLSA does not require breaks, means there is room in the statutory and regulatory scheme for the DOL to adopt a policy like Chapter 31a01(c) to regulate the compensability of "unauthorized extensions of authorized employer breaks."

The Court is also doubtful that Chapter 31a01(c)'s alleged break with the previous policy alone is sufficient to deprive Chapter 31a01(c) of *Auer* deference. Even if Chapter 31a01(c) was inconsistent with the interpretation espoused in 1996 Opinion Letter, the DOL's position has now been held for 14 years without change. The cases withholding deference because of an agency's inconsistent position involved situations where the agency switched back and forth between inconsistent positions in a short period of time or where the agency switched positions in response to litigation, creating an unfair surprise for litigants. *See, e.g., SmithKline*, 132 S. Ct. at 2167 (2012); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987); *Sandifer v. U.S. Steel Corp.*, 678 F.3d 590, 598 (7th Cir. 2012), *aff'd,* 134 S. Ct. 870 (2014). That is not the case here.

The Court is more sympathetic to the argument that courts should not be giving the force of law to agency's informal interpretations willy-nilly, particularly in situations like this one where there is no transparency about how and why DOL wrote Chapter 31a01(c). DOL has

provided no public explanations about what problem Chapter 31a01(c) was intended to address or in what scenarios they think it should apply. Unlike when regulations go through the notice-and-comment process, there was no opportunity for the public to give input nor any requirement for the agency to respond. If, as Alorica argues, DOL intended to create a safe harbor provision for employers who wished to provide breaks without fearing that employees would abuse the privilege, DOL could and should have gone through the regular regulatory process. Doing so would have prevented the Court from having to guess the DOL's intentions. In the face of binding Supreme Court and Ninth Circuit authority, however, the Court defers to the DOL's interpretation of its own ambiguous regulation, regardless of how informally the interpretation was done.

Thus, applying *Auer* deference to Chapter 31a01(c) and the 2001 Opinion Letter, the Court interprets "hours worked" as including all rest periods of short duration (about 5 to 20 minutes). 29 U.S.C. § 785.18. There are only two exceptions. First, breaks taken to express breast milk need not be compensated. 29 U.S.C. § 207(r). Second, if an employer has "expressly and unambiguously communicated to the employee that: (1) The authorized break may only last for a specific length of time; (2) Any extension of such break is contrary to the employer's rules; and (3) Any extension of such a break will be punished," then unauthorized extensions of authorized breaks need not be compensated. Field Operations Handbook, ch. 31a01(c).

The Court interprets the Chapter 31a01(c) carve-out as a narrow one. First, the Court interprets "extension" as the minutes immediately following a time-limited break allowed by the employer, not additional breaks. Thus, while an employer can refuse to compensate an employee for going over, without permission, the time-limited break permitted by the employer, the employer must still compensate for the employee for additional breaks taken with or without the employer's permission. Second, if the employer permits the employee to take short breaks that are not specifically time limited, i.e., "bathroom breaks" or "water breaks" as needed, those must be compensated as well. "Extensions" of non-time-limited

breaks must also be compensated, regardless of whether the employer labels them as authorized or unauthorized.

The Court's interpretation is supported by the text of Chapter 31a01(c). The language of Chapter 31a01(c) itself speaks only about "authorized breaks" that last a specific length of time and unauthorized extensions of those breaks. The most natural reading of the word "extension" is a "part that is added to something to enlarge or prolong it; a continuation." Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/extension (last visited Dec. 1, 2014); *see also* Merriam-Webster, http://www.merriam-webster.com/dictionary/extension (defining "extension" as "an increase in length of time") (last visited Dec. 1, 2014). The 2001 DOL Opinion Letter, the only authority on Chapter 31a01(c)'s interpretation, only addresses a scenario where the employer permitted a time-limited break and the employee exceeded that break without permission. *See* 2001 DOL Opinion Letter. Without some indication from the DOL that Chapter 31a01(c) goes beyond this narrow circumstance, the Court sees no reason to diverge from Section 785.18's and the 1996 Opinion Letter's default rule that all short rest periods should be compensated. In addition, limiting the carve-out to only those scenarios where compensability can be determined by measuring the specific amount of time that the employer allows for a break against the time the employee spent on break saves the factfinder from having to inquire into the minutiae of an employee's break activities. A factfinder would not have to ask, for instance, whether chatting for a few minutes with a co-worker in the bathroom counts as part of a "bathroom break" or whether stopping at the ATM is part of a "coffee break," etc., precisely the type of questions that the DOL wished to avoid. *See* 1996 DOL Opinion Letter.

Thus, the Court holds that all rest periods of short duration must be compensated except for breast milk expression breaks and in the narrow circumstances allowed by Chapter 31a01(c) of the Field Operations Handbook.

//

//

//

### III.   Cross-Motions for Summary Judgment

#### A.  Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

//

### B.  Discussion

#### 1.  Whether All of the Log-Out Episodes Are Compensable as a Matter of Law

Plaintiffs seek summary judgment on one issue: that Alorica violated FLSA by not compensating for the brief log-out episodes because short breaks of less than 20 minutes are compensable as a matter of law, regardless of the reason for those short breaks. However, not all short breaks are compensable as a matter of law. Under Chapter 31a01(c), employers need not pay for unauthorized extensions of authorized breaks, assuming that the employer has clearly communicated its break policy to its employees. In addition, under 29 U.S.C. § 207(r), employers need not pay for breast milk expression breaks. In order to determine whether the log-out episodes are compensable, the factfinder must determine whether they were unauthorized extensions of authorized breaks or part of a breast milk expression break. Thus, Plaintiffs' Motion for Partial Summary Judgment is DENIED.

#### 2.  Whether Alorica's Policies Complied with Chapter 31a01(c) of DOL's Field Operations Handbook

Alorica seeks summary judgment that it is permitted under Chapter 31a01(c) to refuse to compensate their CSRs for any breaks beyond the two scheduled breaks and bathroom breaks as needed. In order to qualify for this exception from the general rule that all short breaks of 5-20 minutes must be paid, Section 785.18, Alorica must show that it "expressly and unambiguously communicated to [its] employee[s] that: (1) The authorized break may only last for a specific length of time; (2) Any extension of such break is contrary to the employer's rules; and (3) Any extension of such a break will be punished." Field Operations Handbook, ch. 31a01(c).

It is undisputed that Alorica permits its CSRs to take two 10-15 minute scheduled breaks each day and bathroom breaks as needed and that Alorica pays for those breaks. It is also undisputed that Alorica does not pay for short breaks other than those. D-SUF No. 9. What is disputed is whether this policy was expressly and unambiguously communicated to its employees.

Alorica's written policy is contained in various documents. One document titled "Avaya Phone Basic Information" was allegedly distributed to CSRs at facilities utilizing hardphone technology. The document states in bold on page 2: **"Remember: You stay logged into the Avaya phone for breaks and lunch."** D-SUF No. 18. Plaintiff Carlile, who started working at Alorica in April 2010, Compl. ¶ 24, signed a copy of the document on April 27, 2010, acknowledging that she had read, understood, and agreed to abide by the procedure laid out in the document. *See* Tarlow Decl. Ex. E (Dkt. 148-5).

CSRs who worked at facilities which utilized the soft phone technology were allegedly issued a document titled "Softphone Basic Information and Acknowledgement." This document states on page 1 that "The first thing you should do at the beginning of your shift is to log onto Softphone." It explains that:

> SOFTPHONE (i.e. the software tool you were trained to use) IS THE TOOL THAT CAPTURES YOUR TIME FOR PAYROLL PURPOSES so it is very important that you log onto it at the start of your shift in order to get paid before doing any and all work.

Page 4 of this document explains that:

> Aux Codes are to be used when on breaks (i.e., each Agent will have scheduled paid breaks depending on their shift, plus restroom breaks as necessary), lunches and other authorized assignments. Break code may be used for the authorized breaks and restroom. Meal break will be the code you may use for lunch/mealtime. Coffee, snack and restroom breaks are not bonafide meal periods and you must be careful to use the correct Aux Code to classify these paid non-meal period breaks. At all other times agents are expected to be in 'Ready' status and receiving calls.

At the bottom of page 4, it states:

> How to Log Out of the Softphone At The End Of Your Shift 1. After all necessary actions to wrap up your work including finishing customer calls and notes, etc. is done then while in a 'NotReady' status click on the "Logout" icon. 2. Softphone logs you off the system and SAP. The "Logout" icon logs you out of the software and the payroll time clock.

The Softphone Basic Information document does not instruct the CSR to log off during their shift on breaks. D-SUF No. 19. Plaintiff Pizana signed a copy of this document on January 9, 2013. *See* Tarlow Decl. Ex. J (Dkt. 148-10).

Alorica also allegedly issued a written "Time Clock Policy" to CSRs which states:

> Non-Exempt employees with a bona fide meal break are required to clock-in/out on four (4) separate occasions during an eight (8) hour scheduled shift (in and out for their shift and in and out for their meal break) . . . Non-exempt employees are to be completely relieved from their work during their bona fide meal break. If the employee is required to perform during their meal break, this would be considered time worked. Coffee or snack breaks are not bona fide meal periods. These are rest or break periods and do not require clocking-in or out, they only require that the non-exempt employee use the correct Aux Code to classify their break time. It is the responsibility of the employee to follow through with the above procedure to ensure the employee is paid accurately for time worked.

D-SUF No. 20. Plaintiff Luper testified that she received, read, and signed the document. Tarlow Decl. Ex. H (Luper Dep. 30:13-31:5, Ex. 2). Bass received and signed this document. Tarlow Decl. Ex. B (Bass Dep. Ex. 1).

Alorica has also maintained an Employee Handbook from at least January 10, 2010 to the present. Alorica presents three editions of the Employee Handbook as evidence of its timekeeping and break policy, one with a footer stating "Copyright 1999-2010" ("2010 edition"), one with a footer stating "Copyright 1999-2011" ("2011 edition"), and one with a footer stating "Revised 07.09.2012" ("2012 edition"). *See* Tarlow Decl. Ex. C (Beckerley Dep. Ex. 3); Ex. D (Campos Dep. Ex. 2); Ex. L (Shaw Dep. Ex. 23). All three editions contain the following statement in the Attendance and Absences section:

> The Company relies on your work and expects regular attendance during work hours. We expect you to be present promptly at your scheduled starting time, and to continue to work until the scheduled ending time. Unsatisfactory attendance, reporting late or leaving early may result in disciplinary action, up to and including termination of employment.

The "Standards and Conduct" section of the 2010 edition states:

The Company strives for an efficient, productive, fair and safe work environment that fosters dedication and mutual respect among employees. Employees are expected to conduct themselves in a manner that promotes a positive work environment. . . .

The Company does not limit its authority to discipline or discharge employees whose actions negatively affect an efficient, productive environment. The following are examples of conduct that may lead to disciplinary action, up to and including immediate termination or employment. These are only examples and this should not be viewed as an all inclusive list.

- Excessive tardiness or absenteeism
- . . . .
- Working unauthorized overtime, or failure to report overtime hours worked.

The "Standards and Conduct" section was revised slightly in the 2011 and 2012 editions:

The Company strives for an efficient, productive, fair and safe work environment that fosters dedication and mutual respect among employees. . . . Each of our employees shall conduct themselves with integrity and show respect for all those around them in the workplace, including fellow employees, our clients and our vendors. As an employee of the Company, conducting yourself with integrity means . . .

- Adhering to your schedule and attendance procedures.
- . . . .

Some examples of UNACCEPTABLE actions while you are involved in Company business (whether on or off Company premises) which violated the Code include, but are not limited to, the following:

- Excessive tardiness or absenteeism
- . . . .
- Working unauthorized overtime, or failure to report overtime hours worked.
- . . . .

Any conduct that compromises the values of the Code may be the basis for investigation or disciplinary action if the Company reasonably believes such conduct may negatively affect or harm your job performance or the well-being of others around you in the workplace.

Plaintiff Pizana testified that he signed an acknowledgment of receipt of the Employee Handbook. Pizana Dep. 47:9-48:5.

More recently, Alorica distributed to its employees new versions of the hardphone, softphone, and time clock policy documents above. These new documents, dated May 2013, state that:

> All Aux Codes including Break code are paid time for your payroll clock purposes. . . . Break time is paid time and will be the code you may use for your scheduled rest breaks and restroom usage as necessary. Scheduled breaks may only last for the specified period of time and except as otherwise stated in this Policy, shall not exceed the total time allotted for them, whether single or combined. However, when necessary at any time during their shift employees may use the restrooms and this will still be paid time outside of the scheduled break times. If you need to use the restroom other than on your scheduled breaks, please hit the Break aux code just as you do when on a scheduled break. Employees who claim to use the restroom on other than their scheduled breaks, but who do not actually use the restroom when claiming to do so and instead take added personal breaks over and above their scheduled break and/or in addition to the scheduled break time, are taking unauthorized rest breaks against the Company's policies. Those employees are subject to discipline and the Company likewise has no obligation to pay for such additional and excess rest breaks.

Softphone Basic Information Policy and Acknowledgment (last revised in May 2013), Declaration of Cornelius Colao (Dkt. 139) Ex. 3; *see also* Hard Phone Basic Log In/Out Policy and Acknowledgment (containing virtually identical language; no revised date), Colao Decl. Ex. 2; Time Clock Policy and Acknowledgment (containing similar language; last revised May 2013), Colao Decl. Ex. 1.

At the bottom of each document is a section labeled "Acknowledgment" which states:

> If you are entering into employment with Alorica, please sign below to reflect that you have received a copy of the above stated Policy and understand its terms and conditions. For those of you already employed by Alorica, please sign below to acknowledge that you agree (a) this Policy has been in place during the entire period of your employment with Alorica, (b) to abide by this Policy and procedure regarding proper use of the log on/ log out Softphone system, (c) you were trained to follow this Policy, and have consistently been instructed to adhere to it by your team leaders and other supervisors, throughout your employment with the Company and/or when Softphone was introduced, (d) that you have always, and

will continue to check your timesheets for any inaccuracies and promptly report same in accordance with this Policy and (e) from time to time in the past and in the future, you may voluntarily choose to report to work early before your assigned shift at your own discretion which is allowed by the Company so long as you do not disrupt business but such early attendance is not required by the Company and is unpaid. You acknowledge and agree that the Company can change, delete or add to any part of this Policy from time to time in a writing that expressly supersedes it in whole or in part and in its sole and absolute discretion.

Defendant has not explained the circumstances under which these documents were distributed to and signed by its employees. Alorica claims that 13,000 (96%) of its employees have signed the acknowledgments. Sixty employees (none Opt-in Plaintiffs) who signed the acknowledgments around April and May 2014 have filed declarations that the policy described in these newer documents has been in place since they started working at Alorica. Some began working at Alorica before January 18, 2010. *See* Colao Decl. ¶ 10.

Plaintiffs argue that Alorica's written policy documents are contradicted by other Alorica policy documents and by managers' instructions. One document entitled "EIS Responsibility Guide," dated February 8, 2011, appears to direct "All Employees" to "log in and out of breaks, log in and out of lunch [and] log out for the day" on a daily basis. EIS Responsibility Guide, Second Vaught Decl. Ex. D (Romagnino Dep.), Ex. 306 (Dkt. 187-4). There is no evidence showing whether any CSRs received this document; however, some Plaintiffs have also testified that their managers told them to log out for breaks, contradicting the written policies. Carlile Dep. 21:21-22:4, 27:2-14; Reynolds Dep. 23:17-25, 24:1-21; Shaw Dep. 103:2-11; Whitmore Dep. 188:2-14; Lillehagen Dep. 98:17-25. In July 2013, Alorica issued a memorandum to its managers explaining that employees were not supposed to log out during breaks, which, in Plaintiffs' view, suggests that there was a problem with managers instructing employees to log out for breaks before July 2013 or managers being too hasty in logging employees out if they were away from their workstations.

Plaintiffs also argue that the acknowledgments of the May 2013 documents should be discounted because Alorica has not provided any explanation about the circumstances under which the employees signed it. The Court agrees that the acknowledgments appear questionable

on their face. While fairly commonplace for employers to ask employees to sign to acknowledge receipt of a new policy, it is odd to ask employees to sign their names to acknowledge in hindsight that a revised or clarified policy has always been in place and that they were trained on it in the past without explaining why the acknowledgment is necessary or providing an alternative way to acknowledge receipt.

With or without the acknowledgments, however, the problem with the evidence raised by Plaintiffs is that they do not speak directly to the standard in Chapter 31a01(c). What Plaintiffs believed about whether they were supposed to log out during breaks does not affect whether the breaks were "authorized" or "unauthorized" by Alorica nor whether Plaintiffs would be "punished" for extending authorized breaks without permission. When asked about what they understood regarding Alorica's formal break policy, Plaintiffs stated that Alorica allowed two scheduled breaks of 10 or 15 minutes per day plus bathroom breaks as needed. Amend Dep. 49:16-22; Beckerley Dep. 27:23-29:1; Carlile Dep. 14:15-16:4; Luper Dep. 17:17-18:15; Moore Dep. 34:8-35:10; Pizana Dep. 12:11-16, 16:9-25; Reynolds Dep. 46:6-24, 49:17-50:14; Shaw Dep. 62:26-63:23; Whitmore Dep. 89:4-10. Alorica's older policy documents were obviously not as closely modeled on Chapter 31a01(c) as the documents from May 2013. For instance, the Avaya Phone Basic Information, Softphone Basic Information Documents, and Time Clock Policy do not specifically characterize extending scheduled breaks as being against the company's rules. That must be inferred from the Employee Handbook's prohibition against excessive tardiness and absenteeism. However, Plaintiffs' testimony demonstrates that, even though the exact wording of the documents was not as precise as one may wish, Plaintiffs got the message from Alorica's written policies and from its managers' instructions that company policy was to allow only the two scheduled breaks per day plus bathroom breaks as needed and that Alorica's schedule adherence policy required Plaintiffs to be punctual in returning from breaks.

Based on this record, the Court concludes that there is no genuine issue of material fact as to whether Alorica "expressly and unambiguously communicated to [its] employee[s] that: (1) The authorized break may only last for a specific length of time; (2) Any extension of such

break is contrary to the employer's rules; and (3) Any extension of such a break will be
punished." Field Operations Handbook, ch. 31a01(c). Thus, the Court GRANTS summary
judgment on the issue. Alorica need not compensate its employees for unauthorized extensions
of authorized breaks.

### 3.   Whether Alorica Had Actual or Constructive Knowledge that CSRs Were Not Being Compensated for Compensable Work During the Log-Out Episodes

#### a.   Legal Standard

To violate FLSA, the employer must have actual or constructive knowledge that its
employees performed work without being compensated. *See* 29 C.F.R. § 785.11. The Ninth
Circuit has held that

> an employer who knows or should have known that an employee is or was
> working overtime . . . . cannot stand idly by and allow an employee to perform
> overtime work without proper compensation, even if the employee does not make
> a claim for the overtime compensation.
>
> However, where an employer has no knowledge that an employee is engaging in
> overtime work and that employee fails to notify the employer or deliberately
> prevents the employer from acquiring knowledge of the overtime work, the
> employer's failure to pay for the overtime hours is not a violation of [the FLSA].

*Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981) ("*Forrester II*"). In
*Forrester*, the plaintiff was the manager of the bakery department at a grocery store. He usually
worked from 6 am to 2:30 pm. He also worked eight hours on Saturdays, for which he was paid
overtime. In his lawsuit, Forrester claimed that the store failed to pay him for all his overtime
hours because he actually worked 2-3 hours more than scheduled each weekday and that the
store had not compensated him for that time. *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 475 F.
Supp. 630, 631 (D. Or. 1979) ("*Forrester I*"). The Ninth Circuit denied Forrester's overtime
claim because he "deliberately omitted the inclusion of those hours from his time sheet" and
otherwise failed to inform his superiors of his overtime work, even though he knew that the
store's policy was for employees to report overtime on his timesheets and "even though he

admittedly knew that he would have been paid for those hours" had he reported them. *Forrester II*, 646 F.2d at 414. The Ninth Circuit reasoned that "where the acts of an employee prevent an employer from acquiring knowledge, here of alleged uncompensated overtime hours, the employer cannot be said to have suffered or permitted the employee to work in violation of [29 U.S.C.] § 207(a)." *Id.* at 414-15. Thus, where an employer does not know and has no reason to know that an employee is working overtime *and* the employee prevents the employer from acquiring knowledge of the overtime, an employer need not pay for that overtime. *Id.* at 414.

The Ninth Circuit has provided no further guidance on how to determine whether an employer has actual or constructive knowledge of off-the-clock work. Other circuit courts have expounded upon the constructive knowledge requirement. In the Sixth Circuit, an employer has no constructive knowledge of uncompensated overtime when the employee fails to follow the employer's "reasonable procedures" for reporting hours worked. *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012) ("When the employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA."). In *White*, a hospital had an auto-deduct policy under which nurses' hours worked were automatically deducted 30 minutes each day to account for the 30-minute unpaid meal period they were expected to take. However, if a nurse's meal period was interrupted by work, he or she was expected to record the time worked in an exceptions log so that that time would be compensated. The plaintiff used the exceptions log at first and was compensated for the time that she reported. Sometimes she would tell her supervisors or human resources that she missed a meal break, but she did not tell them she was not compensated. However, she stopped reporting the times when her meal break was interrupted because it was "an uphill battle." The Sixth Circuit held that plaintiff's FLSA claims failed because she did not use the hospital's reasonable, established procedure.

The Fifth Circuit has held that, as a matter of law, "'access' to information does not constitute constructive knowledge" that employees are working overtime. *Newton v. City of Henderson*, 47 F.3d 746, 749 (5th Cir. 1995). In *Newton*, a police officer was formally

employed by the City of Henderson Police Department, but was assigned to work on a task force

of the United States Drug Enforcement Agency (DEA). Newton sued the City for unpaid

overtime hours that he worked while he served on the task force. During the relevant time

period, the City's policy required employees to obtain approval prior to working overtime.

Newton received permission to work up to 12.5 hours of overtime, but his requests for

additional overtime were turned down. Newton was paid for all the hours claimed on his time

reports, but he did not report and was not paid for the unauthorized overtime hours for which he

sought compensation in the lawsuit. In determining whether the City had actual or constructive

knowledge of Newton's unauthorized overtime work, the Court considered the following facts:

(1) that Newton reported his activities on a daily basis to his City supervisors; (2) his

supervisors were aware that Newton was working long hours, as undercover officers often do,

but assumed that he was taking flex time, which he was permitted to do; (3) one of Newton's

City supervisors, Police Chief Freeman, had access to information about what members of the

DEA task force were doing through his role as city manager and as a member of the task force's

board of directors. Based on this record, the Court held that the City did *not* have constructive

knowledge of the employee working overtime because holding that Freeman's ability to

investigate constituted constructive knowledge would mean that the City did not have the right

to require an employee to adhere to its procedures for claiming overtime. *Id.* at 749-50.

The Eleventh Circuit takes a slightly different tack. The Eleventh Circuit measures an

employer's knowledge

> in accordance with his duty to inquire into the conditions prevailing in his
> business. . . . In reviewing the extent of an employer's awareness, a court need
> only inquire whether the *circumstances* were such that the employer either had
> knowledge [of overtime hours being worked] or else had the opportunity through
> reasonable diligence to acquire knowledge.

*Reich v. Dep't of Conservation & Natural Res., State of Ala.*, 28 F.3d 1076, 1082 (11th Cir.

1994) (internal citations and quotation marks omitted) (alteration in original). In *Reich*, plaintiffs

were state law enforcement officers charged with enforcing Alabama's game and fish laws.

They worked out of their homes and were expected to respond to citizens' complaints at all hours of the day and night and to report their time worked to their employer. Their department issued an official policy to forbid overtime. However, the plaintiffs continued to work over 40 hours each week during the busy hunting seasons without reporting their overtime hours on their timesheets. The Court held that the department had constructive knowledge of the overtime because plaintiffs' supervisors received plaintiffs' arrest reports showing that plaintiffs were working on days or at hours that they had not reported on their timesheets and the supervisors had been lax in following the department's instruction to closely monitor overtime hours. With reasonable diligence, the employer could have discovered that the officers were still working overtime despite the employer's official policy. *Id.* at 1083-84.

The Eighth Circuit reconciles the Fifth, Sixth, and Eleventh Circuit standards—that mere access to information is not constructive knowledge and that the employer has a duty of reasonably diligent inquiry. In *Hertz v. Woodbury Cnty., Iowa*, 566 F.3d 775 (8th Cir. 2009), the Eighth Circuit held that access to non-payroll records which could have alerted the employer to the fact that its employees were working unpaid overtime did not give the employer constructive knowledge because it was not reasonable to expect the employer to weed through those records on a daily basis to determine whether or not employees worked more than their scheduled hours, particularly where employees regularly used the employer's established procedure for reporting overtime. The court cautioned, however, that it was not foreclosing the possibility that access to records could constitute constructive knowledge, only finding that expecting the employer to comb through those records everyday in that particular case was expecting more than "reasonable diligence." *Id.* at 781-82.

In summary, the Fifth, Sixth, Eighth, and Eleventh Circuits have all built upon the Ninth Circuit's *Forrester* decision in determining when an employer has actual or constructive knowledge and what role an employee's failure to notify the employer plays in that inquiry. Defendant urges the Court to apply the standard from the Sixth and Fifth Circuits, which protect the employer from liability when employees fail to use the employer's reasonable time reporting procedures and impose no duty on the employer to investigate whether employees are being

compensated for all the time worked even if the employer has access to the information. Plaintiffs argue that the Eleventh Circuit's standard of requiring employers to conduct a reasonable inquiry and treating inquiry notice as constructive knowledge is more faithful to the spirit of FLSA.

The Court agrees with Plaintiffs. Under the Ninth Circuit's opinion in *Forrester*, the employee's failure to notify the employer only becomes an issue after it is established that the employer had no knowledge and no reason to know. *See Forrester*, 646 F.2d at 414 (holding that the employer does not violate FLSA if the employer had no knowledge or reason to know *and* the employee fails to notify the employer or otherwise prevents the employer from finding out about the work). Thus, contrary to what Defendant urges, the employee's failure to use the employer's time reporting procedures or otherwise notify the employer is not dispositive evidence that the employer did not have knowledge.

As to whether inquiry notice is constructive knowledge for FLSA purposes, the Court is persuaded that it is. The actual or constructive knowledge requirement originates from the idea that FLSA only applies when the employer "suffers" or "permits" the employee to work. 29 U.S.C. § 203(g); *see Forrester*, 646 F.2d at 414. The DOL's regulations provide that "[w]ork not requested but suffered or permitted is work time." 29 C.F.R. § 785.11. The reason why an employee might continue working after the end of his or her shift, for example, is immaterial. *Id.* "In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so." 29 C.F.R. § 785.13. The Ninth Circuit echoes the regulations. *Forrester* held that, an employer who knows or should have known that an employee is working "*cannot stand idly by* and allow an employee to perform [that] work without proper compensation, even if the employee does not make a claim for [that] compensation." *Forrester*, 646 F.2d at 414 (emphasis added). Thus, employers who have some reason to believe that the employees are working without compensation must take action to ensure that employees are being properly compensated. The

employer cannot "sit back" and assume that employees will bring each unaccounted-for hour to its attention, even if the employer has a general policy that employees should report all the hours they work. The prohibition against "sitting back" or "standing idly by" requires the employer to take reasonable steps to investigate the suspected non-compensation, to ensure that the employee is paid for the work that has already occurred, and to stop future non-payment for work or compensable breaks from occurring.

### b.  Analysis

The Court first considers whether Alorica knew or had reason to know that its CSRs were not being compensated for the log-out episodes. Alorica possessed all the timekeeping records showing the challenged hours. Moreover, Alorica's managers and payroll personnel routinely audited those records. It was therefore no secret to Alorica that the log-out episodes were occurring. It was also Alorica's express policy not to compensate their employees for logged-out times. Thus, the Court concludes that, because of the way that Alorica maintained its timekeeping and payroll records, Alorica can be fairly charged with actual or at least constructive knowledge that each of the log-out episodes occurred and that CSRs were not compensated for that time.

The more difficult question is whether Alorica knew or should have known that Plaintiffs were doing compensable work (including taking compensable breaks) during the uncompensated log-out episodes. Defendant argues that, because the CSRs were instructed not to log out during their shifts and because the CSRs generally knew that the company expected them to review their timesheets regularly and to report pay discrepancies, under the Sixth Circuit's standard in *White*, Alorica had no constructive knowledge that its CSRs were actually engaged in compensable work during the log-out episodes. Defendant further argues that it had no duty to inquire further.

The Court disagrees. Under the Ninth Circuit's *Forrester* opinion, if the employer has reason to know that its employees are working without proper compensation, the employer cannot stand idly by and allow it to happen, even if the employee does not make a claim. The employer is legally required to pay. 646 F.2d at 414. If the employer is not sure that it is

required to pay for all of the time, the employer cannot assume that all of the time was non-compensable time. This is especially so in a case such as this one.

Here, unlike in *White*, *Newton*, *Hertz*, and even *Forrester*, the CSRs are not alleging a FLSA claim based on work that took place outside their regularly scheduled shifts or outside the view of their supervisors. The brief log-out episodes at issue occurred in the middle of Plaintiffs' regular shifts. Because of this fact and because of the legal presumption that all short rest periods must be compensated, except for two narrow exceptions (breast milk expression breaks and unauthorized extensions of authorized breaks), Alorica should have considered that it was likely that at least some of those log-out episodes involved the CSRs either engaging in active work or taking compensable breaks.

Moreover, Alorica closely monitors CSRs during the workday. For the most part, a CSR's job requires the CSR to stick close to the area where the CSRs sit taking calls. Alorica's policy and practice was for managers to log out CSRs from their computers if the CSR was away from their workstation or if their computers were in an idle state for over 30 minutes, which means that managers closely monitored or at least were supposed to closely monitor what the CSRs were doing throughout the day. In addition, the evidence shows that some managers expressly instructed CSRs to log out or to hit the unpaid "Lunch" AUX code for their scheduled breaks, even though company policy was for CSRs to be paid for their scheduled breaks. Carlile Dep. 21:21-22:4; Reynolds Dep. 23:17-24:21; Shaw Dep. 103:2-11; Amend Dep. 48:6-10, 49:16-50:13. While the CSRs may be in the best position to know exactly what they were doing each minute of the day, circumstances did not require Alorica to rely on the CSRs' reporting in order for Alorica to know what they were doing. The nature of their work and of their workplace meant that CSRs' activities were closely monitored each day. In this litigation, Defendant chastises Plaintiffs for failing to report discrepancies and have those problems fixed as they occurred because now Plaintiffs cannot remember exactly what occurred. That same criticism could also be applied to Alorica.

Based on this record, the Court concludes that a jury could find that Alorica did know or should have known that its employees were working or taking compensable breaks without

being paid. Thus, the Court DENIES Alorica's request for summary judgment on the issue of whether Alorica knew or should have known that Plaintiffs were doing compensable work or taking compensable breaks during the uncompensated log-out episodes,

### 4.   Whether Plaintiffs Are Estopped from Disputing Hours Worked

Alorica seeks summary judgment that Plaintiffs are estopped from claiming that they worked more hours than they claimed on their timesheets because Plaintiffs failed to follow the Alorica's reasonable procedure for reporting discrepancies on their timesheets.

There appears to be a circuit split as to whether an employee's failure to accurately report his or her time on his or her timesheets estops the employee from challenging those timesheets in a FLSA suit. In a case where the employee failed to report all of his time worked on his timesheet, the Second Circuit held that the idea that a plaintiff is "precluded from challenging his own time sheets by estoppel . . . [is] inconsistent with both the language and the policy of the Fair Labor Standards Act." *Caserta v. Home Lines Agency, Inc.*, 273 F.2d 943, 946 (2d Cir. 1959); *accord Burry v. Nat'l Trailer Convoy, Inc.*, 338 F.2d 422, 426-27 (6th Cir. 1964) (citing *Caserta*). The Second Circuit reasoned that, if employers and employees cannot agree through contract to waive the employee's FLSA rights and if an employee's prior acceptance of some wages does not estop the employee from recovering damages if he proves he worked longer, then an employee's failure to report all of his time worked in his contemporaneous timesheet was no basis for estoppel. *See Caserta*, 273 F.2d at 946-47.

The Fifth Circuit, however, has held the opposite. In *Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324 (5th Cir. 1972), the employee was an industrial homeworker who picked up boxes of parts from her employer and assembled electric light pull cords in her home. The employee recorded that she worked eight hours each day, but she actually worked more hours than she reported because she could not keep up with the pace at which the employer expected her and other homeworkers to work. The employer presented substantial evidence that that pace was achievable by most homeworkers. There was no evidence that the employer encouraged the employees to falsely report their time. "On the narrow facts of this case, the court correctly

granted a directed verdict on the basis that the appellant was estopped and could not profit from her own wrong in furnishing false data to the employer." *Id.* at 1327.

The Ninth Circuit has not spoken directly on the question. However, in *Robertson v. Alaska Juneau Gold Min. Co.*, 157 F.2d 876 (9th Cir. 1946), the Ninth Circuit followed a similar line of reasoning as the Second Circuit in holding that an employee cannot waive his or her rights and cannot be estopped from asserting his rights under FLSA even if he, through his union, forced an unwilling employer to adopt an illegal compensation plan. *Id.* at 879. Given that the *Robertson* Court's reasoning mirrored the Second Circuit's reasoning in *Caserta* and given that equitable defenses in general are not applicable to FLSA claims, *see Bailon v. Seok AM No. 1 Corp.*, No. C09-05483JRC, 2009 WL 4884340, at *5 (W.D. Wash. Dec. 9, 2009), the Court is of the view that an employee's failure to accurately report time worked on his or her timesheet does not as a general matter later estop him or her from recovering damages on a FLSA claim based on unreported time. In any case, the results that Defendant seeks to achieve through its estoppel argument can be achieved through its argument with regard to Defendant's lack of knowledge about Plaintiffs' off-the-clock work.[6]

Thus, the Court DENIES summary judgment on the issue of whether Plaintiffs are estopped from disputing the number of hours they worked.

### 5.  Whether Plaintiffs Can Meet Their Burden of Proof

Alorica seeks summary judgment that Plaintiffs cannot satisfy their burden of proof. Plaintiffs have the burden to prove by a preponderance of the evidence that they performed work for which they were not properly compensated. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). "When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records." *Id.* at 687; *Rural Fire Prot. Co. v. Hepp*, 366 F.2d 355, 360 (9th Cir. 1966) (affirming district court's determination

---

[6] In *Forrester*, the district court granted summary judgment to the employer based on estoppel grounds because the employee had failed to report his claimed overtime hours. *Forrester I*, 475 F. Supp. at 634. The Ninth Circuit affirmed the decision to grant summary judgment, but rather than affirming on estoppel grounds, the Ninth Circuit affirmed on the ground that the employer had no actual or constructive knowledge of the alleged FLSA violation. *Forrester II*, 646 F.2d at 414.

that employer's own business records were sufficient to determine the number of hours worked); *see also Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1279 (11th Cir. 2008) ("[T]he *Mt. Clemens* burden-shifting analysis does not apply" where employer adequately maintained its records.).

If the employer has not kept proper and accurate records, "even where the lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances." *Mt. Clemens*, 328 U.S. at 688. If the employer has not kept accurate records, then the employee carries his burden

> if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* at 687-88.

The parties seem to agree that Alorica kept proper and accurate timekeeping records, such that the parties do not need to apply the "relaxed" burden-shifting standard. The Court is not so sure. There is no dispute that Alorica's timekeeping system kept track, second by second, when their employees were logged in or logged out of the system. However, these timekeeping records do not reflect whether the employees were engaged in compensable work during the brief log-out episodes. Evidence supports the fact that they were doing compensable work. The record before the Court shows that some managers told CSRs to log out during their scheduled breaks or bathroom breaks. Carlile Dep. 21:21-22:4; Reynolds Dep. 23:17-24:21; Shaw Dep. 103:2-11; Amend Dep. 48:6-10, 49:16-50:13. Some Plaintiffs testified that they returned from working away from their workstation to find that they had been logged out or had seen it happen

to others. Bass Dep. 70:15-73:25, 76:3-77:15; Beckerley Dep. 51:23-54:4; Campos Dep. 79:24-83:24; Carlile Dep. 57:5-22; Lillehagen Dep. 13:17-20, 89:6-90:21; Luper Dep. 60:5-63:23; Moore Dep. 62:25-65:21; Tellez Dep. 60:21-61:25. At least one Plaintiff testified that they were logged out of their computer due to a computer failure and the manager did not fix the timesheet. *See* Whitmore Dep. 159:9-158:19. Thus, there is a genuine issue of fact as to whether Alorica's log-in and log-out data captured all of Plaintiffs' hours worked.

The Court thus analyzes the evidence under *Mt. Clemens*'s burden-shifting standard. If the employer's records are incomplete, Plaintiffs can carry their burden of proof if (1) they show that they in fact performed uncompensated work during the log-out episodes and (2) they produce sufficient evidence such that the jury can reasonably infer the extent of the damages. With regard to the first prong, Alorica argues that the timekeeping data also does not reflect whether any CSRs went through the pay discrepancy process and were already paid for some of the log-out episodes. Because no evidence has been presented that the CSRs actually were compensated for any of the log-out episodes, beyond, potentially, the few pay discrepancy forms regarding short periods of less than 20 minutes, Second Vaught Decl. ¶ 73, the Court discounts this argument. There is no genuine issue of fact that Plaintiffs were not compensated for the time reflected in the log-out episodes.

The question is whether Plaintiffs have sufficient evidence that they were performing compensable work and, if so, whether the there is sufficient evidence to allow the jury to reasonably infer the extent of the damages. The Court is persuaded that there is.

With regard to the first issue, whether Plaintiffs have sufficient evidence that they were performing compensable work (or taking compensable breaks), Plaintiffs' greatest stumbling block is that few, if any, can remember what they were doing during specific log-out episodes. However, as described above, there is evidence that Plaintiffs were in fact doing compensable work or taking compensable breaks during the log-out episodes for which they were not compensated. The jury can also infer that Plaintiffs were either working or taking compensable breaks from the fact that the log-out episodes involved brief periods of time in the middle of Plaintiffs' regular work shifts. Moreover, under FLSA, all short rest periods are compensable

except two narrow exceptions, unauthorized extensions of authorized breaks and breast milk expression breaks. Thus, the Court concludes that there is sufficient evidence that Plaintiffs were performing compensable work.

Regarding the exceptions, there is no evidence in the record that any of the Plaintiffs were breastfeeding during the class period. At least a couple of Plaintiffs testified that they sometimes returned late from breaks, Campos Dep. 61:21-62:16; Tellez Dep. 60:21-61:25, which suggests that some of the log-out episodes could have been unauthorized extensions of authorized breaks, for which Alorica does not need to compensate its employees. The jury can reasonably infer which of the log-out episodes were unauthorized extensions from Alorica's AUX data, which that can be analyzed to determine which log-out episodes were immediately preceded by an AUX break code and presumably how many 10-15-minute breaks had been taken that day (to distinguish between scheduled and bathroom breaks). The Court understands that the data is not available for certain subsets of individuals who worked at legacy PRC or Ryla call centers before all employees were transitioned to Alorica's timekeeping system. The data also cannot tell the factfinder with 100% certainty what exactly the CSR was doing while on a Break AUX code or in the moments following when he or she was logged out. Declaration of Dawood Lacewala ¶¶ 12-14 (Dkt. 215). However, it is a reasonable indicator of which log-out episodes were unauthorized extensions of authorized breaks and which were not, at least enough to support a factual finding based on a preponderance of the evidence standard. Thus, the Court finds that this data, in combination with Plaintiffs' representative testimony, constitutes sufficient evidence for the jury to make a rational determination of which of the log-out episodes were compensable, i.e., the extent of the damages.

Thus, the Court DENIES summary judgment on whether Plaintiffs can meet their burden of proof.

//

//

//

//

### 6.  If Alorica Violated FLSA, Whether Alorica Did So in Good Faith

If the Court finds that Alorica did violate FLSA, Alorica seeks summary judgment that Alorica's violation was in good faith and that it had reasonable grounds to believe that its policies complied with FLSA.

Under 29 U.S.C. § 260,

> In any action commenced . . . to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938 . . . , if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

To satisfy § 260, a FLSA-liable employer bears the burden of proving that it acted in subjective good faith and had objectively reasonable grounds for believing that the acts or omissions giving rise to the failure did not violate the FLSA. This is a "difficult" burden, "with double damages being the norm and single damages the exception." *Alvarez v. IBP, Inc.*, 339 F.3d 894, 910 (9th Cir. 2003) (citing *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)). Where the employer "fails to carry that burden," we have noted, "liquidated damages are mandatory." *Id.*

Alorica argues that their formal timekeeping and compensation policies reflect an effort to comply with the FLSA. However, as Plaintiffs point out, Alorica's records reflect thousands of uncompensated log-out episodes and Alorica has not yet disproved that it had actual or constructive knowledge that its employees were engaged in compensable work or on compensable breaks during at least some of those log-out episodes. Based on the current record, the Court declines to exercise its discretion under § 260 at this time. Summary judgment on the good faith issue is thus DENIED without prejudice.

//

//

### 7.  Whether Certain Subsets of the Opt-in Plaintiffs Are Proper Parties to the Collective Action

Alorica also seeks summary judgment that certain subsets of the over 8,700 Opt-in Plaintiffs are not proper parties to this suit because they: (1) signed binding arbitration agreements with Alorica upon accepting employment ("Arbitration Group"); (2) were never employed by Alorica after January 18, 2011 ("Outside Class Period Group"); (3) were employed at Terre Haute, Indiana ("Terre Haute Group"); (4) were plaintiffs in FLSA lawsuits against Alorica's predecessor in interest Ryla, which resulted in court-approved settlement agreements with full releases of liability ("Ryla Group"); or (5) never made it out of training or background check to become a CSR ("Trainee Group").

Anne Romagnino, Alorica's Director of Payroll Operations, states that she identified these subsets by causing Alorica's payroll staff to use Alorica's payroll data to identify individuals who were not eligible to participate in this lawsuit because 1) they were not employed by Alorica after January 18, 2011; 2) they worked at the Terre Haute, Indiana facility; 3) they were opt-in plaintiffs in one of seven previous FLSA actions against Ryla which resulted in a court-ordered settlements including releases of all claims and did not work for Alorica after the effective dates of the settlements; or 4) they never got past the background check or training and nesting phases to become a CSR. Declaration of Anne Romagnino ¶¶ 3-5 (Dkt. 200); *see also* Declaration of Scott Taylor ¶¶ 3-10 (Dkt. 153).

The Court will address the Arbitration Group in a separate order resolving Defendant's Motion to Compel Arbitration.

With regard to the Outside Class Period Group, the Court agrees with Plaintiffs that the class period goes back to August 19, 2010. Thus, the Court DENIES summary judgment as to the Outside Class Period Group.

With regard to the Terre Haute Group, the Court cannot determine from Ms. Romagnino's declaration whether she accounted for the possibility that a CSR who worked at Terre Haute also worked at a non-Terre Haute location during the class period. Thus, the Court DENIES summary judgment as to the Terre Haute Group.

With regard to the Ryla Group, Plaintiffs have not raised any genuine issue of material fact. Defendant has adequately shown that certain Opt-in Plaintiffs released their FLSA claims against Defendant in the Ryla settlement agreements. Thus, the Court GRANTS summary judgment as to the Ryla Group. The claims of Plaintiffs who released their FLSA claims pursuant to the Ryla settlement agreements and who did not work for Alorica after the effective date of those agreements are dismissed.

With regard to the Trainee Group, Ms. Romagnino's declaration states that these individuals did not pass training or nesting and thus never became CSRs. Plaintiffs have not raised any genuine issue of material fact. Thus, the Court GRANTS summary judgment as to the Trainee Group.

### C. Conclusion

For the foregoing reasons, the Court ORDERS as follows with regard to the Cross Motions for Summary Judgment:

(1) Plaintiffs' Motion for Partial Summary Judgment is DENIED.

(2) Defendant's Motion for Summary Judgment is GRANTED IN PART as follows:

- Alorica expressly and unambiguously communicated its break policy to its employees under Chapter 31a01(c) of the DOL's Field Operations Handbook;
- The claims of Opt-in Plaintiffs who released their FLSA claims pursuant to the Ryla settlement agreements and who did not work for Alorica after the effective date of those agreements are dismissed.
- The claims of Opt-in Plaintiffs who never passed the training or nesting phase and never became CSRs are dismissed.

(3) Defendant's Motion for Summary Judgment is DENIED as to all other issues.

### IV.    Motion to Decertify FLSA Collective Action

### A. Legal Standard

As the Court stated in its order granting conditional class certification (Dkt. 67), in determining whether to certify a collective action under the FLSA, a district court must determine if the proposed class is "similarly situated" to the lead plaintiff. A majority of courts

have adopted a two-step approach. *See Leuthold v. Destination Am., Inc*., 224 F.R.D. 462, 466 (N.D. Cal. 2004) (citing district courts adopting the two-step approach and following that approach); *Misra v. Decision One Mortgage Co., LLC*, 673 F. Supp. 2d 987, 992 (C.D. Cal. 2008) (same); *Pfohl v. Farmers Ins. Group*, No. CV 03-3080 DT (RCx), 2004 WL 554834, at *2 (C.D. Cal. Mar. 1, 2004) (same).

Under the two-step approach, a district court first determines, based on the submitted pleadings and affidavits, whether the proposed class should be conditionally certified and notified of the action. *Leuthold*, 224 F.R.D. at 467. Since this first determination is generally made before the close of discovery and is based on a limited amount of evidence, the courts apply a fairly lenient standard and typically grant conditional class certification. *Id*.; *Pfohl*, 2004 WL 554834, at *2.

The second tier in this approach ("Tier 2") occurs after discovery is complete, at which time the defendants may move to decertify the class. *Leuthold*, 224 F.R.D. at 467. At that point, the court again makes a factual determination about whether the plaintiffs are similarly situated. *Pfohl*, 2004 WL 554834, at *2 (citing *Thiessen v. Gen. Elec. Capital Corp*., 267 F.3d 1095, 1103 (10th Cir. 2001)). The Ninth Circuit has yet to interpret the phrase "similarly situated" but district courts and other circuit courts generally see the Tier 2 standard as less lenient than the Tier 1 standard. *See Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007); *Thiessen*, 267 F.3d at 1103; *Leuthold*, 224 F.R.D. at 467. Courts consider the following factors in making the determination: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations. *Leuthold*, 224 F.R.D. at 467. If the district court determines that the plaintiffs are not similarly situated, the court may decertify the class and dismiss the opt-in plaintiffs without prejudice. *Leuthold*, 224 F.R.D. at 467.

## B. Discussion

The Court addresses each of the Tier 2 factors in turn.

//

//

### 1.  Factual and Employment Settings

When examining the degree of similarity in plaintiffs' factual and employment settings, courts consider numerous factors, including (1) the existence of a single policy, custom or practice that violates FLSA and (2) whether plaintiffs are subject to varied work conditions. *Reed*, 266 F.R.D. at 450; *see also Proctor v Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 282-83 (N.D. Tex. 2008); *Vennet v. Am. Intercontinental Univ. Online,* No. 05-4889, 2005 WL 6215171, at *6 (N.D. Ill. Dec. 22, 2005). There are no bright line rules as to what is required; rather, courts have tended to undertake a comprehensive, fact-specific inquiry. The lack of a common policy or the existence of excessive variation among the opt-in plaintiffs may be adequate grounds for decertification, but plaintiffs in a collective action need not be identically situated. *Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1260 (11th Cir. 2008). One common, unified policy is also "not necessarily required to satisfy the similarly situated requirement, especially if a collective action would promote judicial economy because there is otherwise an identifiable factual or legal nexus." *Vennet*, 2005 WL 6215171, at *6. Accordingly, this Court will examine the totality of the circumstances bearing on Plaintiffs' factual and employment settings.

Defendant argues that Plaintiffs fail to satisfy this first prong because Plaintiffs work in different geographic locations, providing various kinds of call center services to different corporate clients, and had different job titles or duties. *See* Decert. Mot. at 4-5 (describing Plaintiffs' job duties as "ranging from answering customer calls or providing customer service to callers, to hybrid sales and support functions with commission compensation, to technical assistance, training and supervisory roles, to helping corporate sales agents process orders, to handling billing issues"). In addition, Defendant argues, Plaintiffs have failed to identify a uniform policy because Alorica's formal policy is that CSRs must be paid for all time worked, that CSRs must accurately report all the time that they worked, and that CSRs must stay logged into the timekeeping system throughout their shift other than perhaps for lunch. In Defendant's view, at worst, all Plaintiffs can show is that *some* managers may have erroneously instructed CSRs to log out in the middle of their shift. Demonstrating that "rogue managers" have deviated

from companywide policy is not sufficient to show that the class was subject to a common policy. *See Gessele v. Jack in the Box, Inc.*, No. 3:10-CV-960-ST, 2013 WL 1326563, at *28 (D. Or. Jan. 28, 2013) (finding that no uniform policy existed where the evidence only showed "decentralized and independent misconduct by some supervisors").

Plaintiffs respond that the differences in job titles and duties are immaterial because they are similarly situated with regard to Alorica's uniform policy and practice of not compensating their employees for the brief periods during the day when they are logged out of the timekeeping system. Plaintiffs' evidence includes Alorica documents and deposition testimony by Alorica executives that the log-in and log-out data are used as the baseline for calculate pay. P-SUF Nos. 10-20.

The Court agrees with Plaintiffs that the variations in the kinds of services that the Plaintiffs were offering to customers over the phone and the variation in whether Plaintiffs usually worked at one workstation or walked around and assisted other employees on the phone are immaterial. There is no dispute that the Plaintiffs used the same or similar timekeeping systems and to the same method of calculating pay. (Although Defendant points out that Kronos was used at certain sites until 2013, Defendant does not argue that Kronos was significantly different from EIS.) Thus, the Court is satisfied that Plaintiffs were similarly situated with respect to Alorica's timekeeping system and the company's policy and practice of not paying employees for logged-out time unless employees went through the pay discrepancy process.

The Court next addresses whether Plaintiffs are similarly situated in that Alorica's timekeeping and payroll practices caused them to experience similar FLSA violations. As discussed above in Part III, the Court cannot assume that all of the brief log-out episodes constituted compensable "hours worked" as a matter of law. Plaintiffs could have been attending team meetings, helping another CSR, or waiting for their computers to be fixed. If so, then they should be compensated because they were indisputably "working." Plaintiffs could have been taking their scheduled breaks or other compensable break, for which they should also be compensated under Section 785.18. Or Plaintiffs could have been taking breast milk expression breaks, in which case Alorica is not required to compensate them under  29 U.S.C. § 207(r). Or

Plaintiffs could have been extending their scheduled breaks without permission, in which case Alorica is not required to compensate them since it "expressly and unambiguously communicated to [its] employee[s] that: (1) The authorized break may only last for a specific length of time; (2) Any extension of such break is contrary to the employer's rules; and (3) Any extension of such a break will be punished." Field Operations Handbook, ch. 31a01(c).

Thus, some Plaintiffs may have suffered a FLSA violation while others may not have. This is not a case, however, in which Plaintiffs are all alleging different theories of FLSA violations. Rather, most of the Opt-in Plaintiffs have experienced brief uncompensated log-out episodes in the middle of their shifts. Differences in the precise reason why each log-out event occurred is immaterial except when the log-out episode occurred while the CSR was extending his or her scheduled break without permission or was on a breast milk expression break. Because most Plaintiffs use the same AUX code system to track their scheduled and bathroom breaks, it is possible to reasonably distinguish, on a class-wide basis, between the log-out episodes which were unauthorized extensions of authorized breaks (no compensation required) and those which were not (compensation required). Since neither side has introduced any evidence that any Plaintiffs actually took breast milk expression breaks, the Court does not address that concern. Thus, the Court finds that Plaintiffs are similarly situated with regard to the FLSA violation that they allegedly faced and that the first Tier 2 factor weighs against decertification.

## 2.  Individualized Defenses

When analyzing the second Tier 2 factor, courts assess "whether defendants' defenses could be applied across the board to plaintiffs' claims and potential plaintiffs' claims or whether many and perhaps disparate defenses could be raised." *Russell v. Illinois Bell Tel. Co.*, 721 F. Supp. 2d 804, 820 (N.D. Ill. 2010). This is primarily a case management decision by the district court. *Anderson v. Cagle's, Inc.*, 488 F.3d at 954 n.8; *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000). Even if a defense does not apply identically to every single plaintiff, the district court need not decertify if the defenses are generalizable to most of them or if the differences between the plaintiffs in relation to the defense are only minor differences.

### a. Defendant's Actual or Constructive Knowledge that Plaintiffs Performed Compensable Work

Defendant argues that the Court must engage in individualized inquiry as to each log-out episode to determine whether Alorica knew or had reason to know that each Plaintiff was performing compensable work during each of the uncompensated log-out episodes. Specifically, Defendant argues that, under the case law described above in Part III.B.3, the factfinder must determine whether each Plaintiff was performing compensable "work" during each log-out episode and, if so, why he or she failed to report each compensable episode to his or her supervisor as uncompensated time. Defendant's theory appears to be that CSRs' claims are barred to the extent that they knew they were working during a log-out episode but failed to report their time through the pay discrepancy process, even though they knew that they would have been paid if they had gone through the discrepancy process.

As discussed above in Part III.B.3.b, the Court is not persuaded that a FLSA claim can be defeated merely by showing that an employee failed to report a timesheet discrepancy, particularly in a workplace where the employees are closely monitored to determine whether they are working at any given time. Such a holding goes too far in the direction of putting the onus on the employee to keep accurate records of hours worked when that responsibility belongs to the employer. 29 U.S.C. § 211(c). Under the Ninth Circuit's decision in *Forrester*, 646 F.2d at 414, Alorica can prove that it lacked actual or constructive knowledge that Plaintiffs were not compensated for compensable work by showing that Alorica did not know and had no reason to know and Plaintiffs deliberately prevented Alorica from finding out that they were doing compensable work by hiding the fact that they were working during the log-out episodes.

The Court foresees that the evidence needed to prove this defense may include reports or other documents circulated among Alorica's management, human resources, and payroll personnel; testimony from those individuals; testimony from Plaintiffs regarding their knowledge about the log-in and log-out policy and the pay discrepancy process; and any pay discrepancy forms submitted by Plaintiffs. Based on the parties' representations at oral argument, there do not appear to be many pay discrepancy forms actually submitted by

Plaintiffs. Even if they were voluminous, they would be more efficiently processed en masse than in 8,700 individual trials. As for documentary evidence of Alorica's written policies and testimony evidence from Alorica's human resources and payroll personnel, these too are better presented in a single trial than in many individual ones. As for Plaintiffs' individual experiences with Alorica's policies, it does not appear to the Court that testimony from every last Plaintiff and Plaintiff's manager is necessary to show either that Plaintiffs in the class knew about Alorica's timekeeping and pay discrepancy policies or that Plaintiffs had problems following those policies. Representative testimony would suffice. Neither is it necessary for each log-out episode to be analyzed individually. None of the cases cited above in Part III.B.3.a regarding the employer's constructive knowledge requirement required that the employer have specific knowledge about every single hour (or this case, every minute) of uncompensated work. Evidence going to the employer's general knowledge or lack of knowledge about its employees' uncompensated work is enough.

### b.  Unclean Hands

Defendant argues that the unclean hands defense also requires individualized inquiry. Defendant claims that the Court must determine on a case-by-case basis whether each Plaintiff was shirking his or her duties by engaging in "call avoidance" or engaging in other misconduct, such as stealing from another employee's purse, during the log-out episodes.

Case law is unclear as to whether and how the equitable defense of unclean hands applies to FLSA claims. In *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360-63 (1995), an employee alleged that she had been fired in violation of the Age Discrimination in Employment Act (ADEA). The employer later learned during discovery that the employee had engaged in some wrongdoing which would have been a legitimate justification for her firing. The Court noted that it had "rejected the unclean hands defense 'where a private suit serves important public purposes,'" such as in private antitrust lawsuits under the Sherman and Clayton Acts. *Id.* at 360. In deciding to allow the unclean hands defense in ADEA cases, the Court considered that the statute controlling the case, 29 U.S.C. § 626(b), provided that "the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the

purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for [amounts owing to a person as a result of a violation of this chapter]." The same language is found in the FLSA statute. *See id.* at 361; 29 U.S.C. § 216(b). The Court also considered that the "ADEA, like Title VII, is not a general regulation of the workplace but a law which prohibits discrimination" and that, in giving effect to the ADEA, the Court had to "recognize the duality between the legitimate interests of the employer and the important claims of the employee." *McKennon*, 513 U.S. at 361. The Court concluded that considering the employee's wrongdoing was "relevant not to punish the employee, or out of concern for the relative moral worth of the parties, but to take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." *Id.* (internal citation and quotation marks omitted). The Supreme Court held that an employee's wrongdoing would generally render reinstatement and front pay inappropriate and might affect the calculation of back pay damages (cutting off back pay damages at the point when the employer discovered the wrongdoing and would have and could have legitimately fired the employee). Ultimately, however, the employee's wrongdoing did not totally bar recovery of back pay.

The question of whether the unclean hands defense is available in FLSA in light of the Supreme Court's decision in *McKennon* has not been squarely and fully addressed by any court. Since *McKennon*, some federal district courts have refused to strike allegations of the affirmative defense of unclean hands in FLSA cases at the pleadings stage, out of an abundance of caution that the unclean hands defense might exist. *Tomason v. Stanley*, 297 F.R.D. 541, 548-49 (S.D. Ga. 2014); *Green v. City & Cnty. of San Francisco Cal.*, No. C06-6953 SI, 2007 WL 521240, at *2 (N.D. Cal. Feb. 15, 2007). Others have stricken allegations of the unclean hands defense for insufficient pleading or decided whether evidence was relevant to an unclean hands defense without opining on whether an unclean hands defense actually exists. *Neuman v. CTRL Sys., Inc.*, No. 09-22508-CIV, 2009 WL 4730722, at *3 (S.D. Fla. Dec. 10, 2009); *Butler v. Homeservices Lending LLC*, No. 3:11-CV-02313-L-MDD, 2013 WL 6196545, at *2 (S.D. Cal. Nov. 27, 2013). Based on this weak case law and given that Defendant has not explained to the

Court how *McKennon* should apply to limit damages in a FLSA wage-and-hour cases like this one as opposed to limiting backpay in, for instance, a FLSA retaliatory firing case, the Court is not prepared to decide whether the unclean hands defense does or does not apply in FLSA wage-and-hour cases. Thus, the Court joins its sister federal district courts in dodging the question and does not consider whether the unclean hands defense requires individualized inquiry as to each Plaintiff.

In conclusion, the Court is not persuaded that Defendant's defenses require individualized treatment as to each Plaintiff.

### 3. Fairness and Procedural Considerations

The goals of the FLSA's collective action procedure are twofold: (1) reducing the burden on plaintiffs through the pooling of resources and (2) efficiently resolving common issues of law and fact that arise from the same illegal conduct. *Reed*, 266 F.R.D. at 462. The court must also ensure that it is capable of coherently managing the class without prejudicing either party. *Id.* (citing *Johnson v. TGF Precision Haircutters, Inc.*, No. Civ. A. H-03-3641, 2005 WL 1994286, at *7 (S.D. Tex. Aug. 17, 2005)).

Allowing this case to proceed to trial as a collective action would clearly meet the first goal. Thousands of individuals have opted in. Each individual's claim is only for a few dollars, making it highly unlikely that an individual would proceed on his or her own even if he or she had a meritorious claim. For most, a collective action is the only way they can hope to recover.

Whether all of the Plaintiffs' claims share common issues of law and fact is less obvious. The Court sees three main issues. According to Plaintiffs' expert, not all CSRs actually experienced log-out episodes. Steward Decl. ¶ 8. This fact does not necessarily destroy certification, as those CSRs were still subject to the same timekeeping and compensation policy. Because the log-in and log-out data is individualized, those CSRs can be dealt with at the damages stage (0 logged-out minutes = $0). Alternatively, the collective action definition can be amended to include only CSRs who experienced brief periods of logged-out time during their shifts. The Court leaves the question of amending the collective action definition to the parties to decide.

Individual inquiry into each log-out episode would be necessary for any Opt-in Plaintiff who breastfed an infant during the class period. However, the possibility that Plaintiffs might have been taking breast milk expression breaks also does not necessarily require decertification. First, Alorica has not presented any evidence that any of the Opt-in Plaintiffs actually used such breaks. Given that Alorica likely has records of its employees' gender and age and may have records of when employees went on maternity leave or added new dependents to their health insurance policies, it is possible to identify who in the class who may have been breastfeeding infants during the class period and thus who needs to have their log-out episodes scrutinized more carefully to determine if they were taking a breast milk expression break. Alorica may also have records of which employees requested such breaks. Ultimately, if necessary, the collective action definition could be amended to exclude CSRs who breastfed infants during the class period. Again, the Court leaves the question of amending the collective action definition to the parties to decide.

Finally, some of the log-out episodes may be unauthorized extensions of authorized breaks for which Alorica need not compensate CSRs since Alorica can take advantage of the Chapter 31a01(c) exception. Again, however, the effort required to inquire into each log-out episode is much more efficiently done on a class-wide basis than in 8,700 trials. Moreover, Alorica is capable of comparing its AUX data to its log-in and log-out data to determine which log-out episodes were reasonably likely to be unauthorized extensions of authorized breaks.

Thus, the third factor weighs against decertification.

### C. Conclusion

For the foregoing reasons, the Court DENIES Defendant's Motion for Decertification.

### V. Disposition

For the reasons stated above, the Court hereby ORDERS as follows:

(1) Plaintiff's Motion for Summary Judgment is DENIED;

(2) Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART;

(3) Defendant's Motion for Decertification is DENIED;

(4) The pre-trial conference and trial dates and associated deadlines are VACATED; and

(5) The parties shall appear for a status conference to discuss scheduling for this case and the related case, *Beckerley v. Alorica, Inc.*, Case No. 8:14-cv-0836-DOC (JPRx), on **January 12, 2015, at 8:30 a.m**.

DATED:        December 10, 2014

_____

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE